UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLGA VISICH and ANDREI VISICH,<br><br>*Plaintiffs*,<br><br>vs.<br><br>B&C PARTNERS LLC, LESLIE BLUHM, DAVID HELFAND, and NEIL BLUHM,<br><br>*Defendants*. | 25-cv-6945<br><br>**COMPLAINT** |

Plaintiffs Olga Visich and Andrei Visich (collectively, "Plaintiffs"), by their undersigned counsel, for their Complaint against Defendants B&C Partners LLC, Leslie Bluhm, and David Helfand (collectively, "Defendants") allege as follows:

**Introduction**

1. This civil action arises from Defendants' unlawful and discriminatory treatment of Plaintiffs Olga and Andrei Visich, a married couple who were jointly employed to maintain and manage Defendants' luxury Southampton estate. After promising manageable workloads and adequate support, Defendants subjected Plaintiffs to grueling work hours without the promised assistance, culminating in a disabling injury to Plaintiff Olga Visich. Rather than accommodate her condition or respond lawfully to her medically necessary surgery and related concerns,

Defendants marginalized both Plaintiffs, unfairly scrutinized their performance, and ultimately terminated them shortly before the busy season—replacing them with significantly younger, non-disabled individuals. Plaintiffs seek redress under the New York State Human Rights Law, the Fair Labor Standards Act, the New York Labor Law, and other applicable law.

**<u>The Parties</u>**

2. Plaintiff Olga Visich is a citizen of the State of New York and resides in Suffolk County.

3. Plaintiff Andrei Visich is a citizen of the State of New York and resides in Suffolk County.

4. Upon information and belief, based on official government agency filings as well as Defendants' verbal representations made to Plaintiffs, Defendant B&C Partners LLC ("B&C Partners") is an Illinois limited liability company with its principal executive office and principal place of business located in Chicago, Illinois.

5. Upon information and belief, based on official government agency filings as well as Defendants' verbal representations made to Plaintiffs and other

reliable sources, all four members of B&C Partners LLC are citizens of Illinois, and none are citizens of, or have their principal place of business in, New York.

6. Upon information and belief, based on Defendants' verbal representations made to Plaintiffs and other reliable sources, Defendant Leslie Bluhm is a citizen of Illinois.

7. Upon information and belief, based on Defendants' verbal representations made to Plaintiffs and other reliable sources, Defendant David Helfand is a citizen of Illinois.

8. Upon information and belief, based on Defendants' verbal representations made to Plaintiffs and other reliable sources, Defendant Neil Bluhm is a citizen of Illinois.

9. Upon information and belief, because B&C Partners was a family-controlled enterprise operated for the collective benefit of the Bluhm–Helfand family (including Defendants Leslie Bluhm, David Helfand, and Neil Bluhm), and because B&C Partners acted primarily through these individuals and through their designated agents, the acts and omissions of each Defendant and of their agents described herein were undertaken within their actual or apparent authority and under their shared direction and control. Accordingly, the conduct of each

Defendant and their agents is properly imputable to each of the other Defendants under settled principles of agency and joint operational control.

## **Jurisdiction and Venue**

10. This Court has subject matter jurisdiction over Plaintiffs' claims herein under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court also has subject matter jurisdiction over Plaintiffs' claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., pursuant to 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiffs' related wage-and-hour claims under the New York Labor Law ("NYLL") pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative fact as the FLSA claim.

12. This Court has personal jurisdiction over each Defendant pursuant to New York CPLR § 302(a)(1) and (a)(2) because each Defendant transacted business and participated in the commission of statutory violations within the State of New York giving rise to the claims asserted herein.

13. Acting on Defendants' behalf, Leslie Bluhm and David Helfand interviewed Plaintiffs in person in New York on February 21, 2024, for full-time employment at 412 First Neck Lane, Southampton, New York (the "Hamptons Mansion and Property"), where Plaintiffs would perform daily maintenance and/or services for the benefit of Defendants and their guests.

14. Defendants, acting individually and through their designated agents, exercised substantial control—directly and/or indirectly—over Plaintiffs' job duties, compensation, and working conditions in New York. Although Defendants Leslie Bluhm and David Helfand (a married couple) resided in Illinois, they periodically visited the Southampton estate, where they interacted with Plaintiffs in person regarding their duties and workplace conditions. In addition, acting principally through Leslie Bluhm, they maintained regular supervisory contact with Plaintiffs from Illinois, directing tasks and expectations through calls, texts, and emails, as well as through Defendants' on-site manager, Chris Alas, and their recruiter and agent, Aleksandra Kardwell. Defendant Neil Bluhm, while not involved in the day-to-day operations, possessed ultimate managerial authority as the sole Manager of B&C Partners, acted at all relevant times in accordance with that title, and exercised sufficient operational control to qualify as an employer for purposes of the FLSA and NYLL.

15. When Plaintiffs were hired, they were presented with a written employment offer signed by Leslie Bluhm and David Helfand, who identified themselves only as "Owners" of the Hamptons Mansion and Property, without reference to any officer or managerial titles. The letter did not clarify whether "B&C Partners" referred to a legal entity or a shared property interest, and instead gave the misleading appearance that Ms. Bluhm and Mr. Helfand were operating as a husband-and-wife partnership or joint proprietors. The document further reflected that they were acting both on their own behalf and on behalf of "B&C Partners," thereby suggesting that B&C Partners was merely an informal business name or d/b/a, rather than a distinct legal entity. In so doing, Defendants acted as agents of a partially disclosed or undisclosed principal, which has legal implications for liability under established principles of agency law.

16. At all relevant times, Manager Chris Alas—acting in his capacity as a designated agent of B&C Partners—referred to "the Family" as Plaintiffs' employers, a term he used to encompass Defendants Leslie Bluhm, David Helfand, and Neil Bluhm. This usage further reflected that all three individual Defendants collectively exercised, or held themselves out as exercising, authority over the terms and conditions of Plaintiffs' employment, consistent with the ambiguous ownership and agency structure described above.

17. In addition, Defendant Neil Bluhm personally visited the Southampton estate in August 2024, after Plaintiff Andrei Visich met him at a nearby airport, during which visit Mr. Bluhm directly observed the condition in which Plaintiffs maintained the mansion and surrounding property and personally benefitted from the services Plaintiffs provided.

18. These facts, taken together, establish that each Defendant purposefully directed employment-related activities into New York, exercised or asserted supervisory authority over Plaintiffs' work performed in New York, and engaged in conduct giving rise to the claims asserted herein. Accordingly, personal jurisdiction is proper under New York's long-arm statute and comports with due process.

19. Each individual Defendant also personally benefitted from Plaintiffs' labor, as they and their family members, friends, and guests enjoyed the services Plaintiffs provided and the exceptional condition in which Plaintiffs maintained the mansion and premises during their stays and visits to the Southampton estate.

20. At all relevant times Defendants constituted a single, integrated employer for purposes of Plaintiffs' discrimination and retaliation claims. Defendants' operations were interrelated, Plaintiffs' work was performed for the shared benefit of all individual Defendants and their family members and guests, and labor relations were specifically controlled through Leslie Bluhm, David Helfand, and their designated agents, including Manager Chris Alas and recruiter

Aleksandra Kardwell. Defendants further shared common ownership and financial control through B&C Partners and common management by the Bluhm–Helfand family. In particular, decisions concerning hiring, supervision, work assignments, staffing levels, scheduling, compensation, discipline, and termination were made jointly or under centralized direction, rendering Defendants a single employer under applicable law.

21. At all relevant times Defendants were also joint employers of Plaintiffs within the meaning of the Fair Labor Standards Act and the New York Labor Law. Under the economic reality of the relationship, Defendants exercised operational and financial control over Plaintiffs' employment, including authority over hiring, work assignments, scheduling, compensation, staffing levels, and termination, rendering each Defendant jointly and severally liable for Plaintiffs' wage-and-hour claims.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial portion of the events or omissions giving rise to Plaintiffs' claims occurred within this District.

## FACTS

23. In February 2024, Defendants sought to hire two experienced employees to maintain their Southampton property and to provide full-service

support to Defendants and their guests during their stays. As a condition of consideration for the roles, Defendants required Plaintiffs Andrei and Olga Visich to undergo a multi-day, in-person trial period at the property in early March 2024. Plaintiffs performed a broad range of duties during that period, demonstrating professionalism, skill, and a strong work ethic. Defendants—including Leslie Bluhm and her son—were very pleased with the quality and diligence of Plaintiffs' work.

24. On March 28, 2024, Defendants hired Plaintiffs Olga Visich and Andrei Visich, a married couple, to work as full-time maintenance and service employees under the title "House Administrator," commencing April 22, 2024, at Defendants' Southampton estate located at 412 First Neck Lane. The position required Plaintiffs to provide comprehensive upkeep and hospitality services for a 5.57-acre property that included a mansion, a guest house, a pool house, and connecting structures, consisting of approximately 39,578 square feet, 9-11 bedrooms, and 12½ bathrooms, as well as extensive landscaped grounds. While Defendants also employed another domestic team—a mother and son—and retained vendors for landscaping and certain specialized maintenance tasks, Plaintiffs bore primary responsibility for the day-to-day operation, upkeep, and service of the estate and its guests.

25. Plaintiffs' stated duties consisted of "taking care of the Premises and providing full service to Owners' and Owners' guests in connection with their residence or stays at the Premises."

26. On May 19, 2024, Andrei Visich was notified that a previously scheduled abdominal MRI had been rescheduled for the following morning, May 20, 2024, at 7:40 a.m. Plaintiffs promptly informed Defendants' Manager, Chris Alas, that they would report to work after the appointment was completed.

27. When speaking to Plaintiffs about this, Manager Alas expressed displeasure, stating in sum and substance that Plaintiffs should try their best to stay healthy and should avoid scheduling medical appointments during the busy season. He added, in sum and substance, that he was not happy about the doctor's appointment and that, going forward, they would need to discuss any future medical appointments.

28. Manager Alas also informed Plaintiffs, in words or substance, that they needed to always get enough work done to prevent the seasonal co-workers, Eric and his mother Ruth, from feeling overwhelmed because the owners loved them.

29. Defendants' recruiter and agent, Aleksandra Kardwell—acting on Defendants' behalf and, upon information and belief, at their direction—not only

facilitated the hiring of Plaintiffs but also maintained ongoing communications with Defendants regarding Plaintiffs' performance, working conditions, and staffing needs. Ms. Kardwell repeatedly told Plaintiffs, both before their start date and during the early part of the summer season, that Defendants would be hiring additional staff to help manage the heavy seasonal workload, and that similar help had been provided the prior summer.

30. Defendants did not hire the promised additional staff, causing Plaintiffs to work very long hours—generally 12 to 15 hours per day and sometimes longer, including multiple instances of working late into the night after preparing for or serving large groups. One such instance occurred on July 6, 2024—David Helfand's birthday—when Plaintiffs were responsible for accommodating a large group of guests, and Plaintiff Olga Visich sustained a serious injury while hurrying to carry heavy laundry down two flights of stairs.

31. As a result of Defendants' failure to hire the promised additional help for the summer season, Plaintiffs were required to work extensive unpaid overtime and endured substantial physical strain and exhaustion.

**Olga Visich suffers a disabling injury**

32. On July 6, 2024—during a particularly busy day of work involving David Helfand's birthday celebration and numerous guests—Plaintiff Olga Visich, overworked and exhausted from having to perform the duties of multiple employees, tore her meniscus while hurriedly carrying a heavy load of laundry down two flights of stairs.

33. Shortly thereafter, Olga Visich's left knee swelled up and she began limping as she struggled through the remainder of her lengthy workday.

34. David Helfand observed Ms. Visich limping and, after learning she had been injured while carrying laundry, stated in sum and substance that it was because she was overworked and had too much to do.

35. David Helfand and Leslie Bluhm were both at the mansion at the time and witnessed Olga Visich limping and wincing in pain. Nevertheless, neither indicated that it would be acceptable for her to stop work early to seek immediate medical attention.

36. As a result, Olga Visich did not go to the hospital until after her workday ended at approximately 11 p.m. (PBMC in Riverhead), at which point her knee was so swollen she could only hobble.

**Notice of Injury and Medical Condition**

37. On July 7, 2024, the day after her injury, Olga Visich informed both David Helfand and Leslie Bluhm that she had been transported to the emergency room after her shift the previous evening due to severe knee pain and swelling and would need follow-up with a specialist. She also advised them that she was experiencing blood clots while urinating and would be seeing a urologist as well. Ms. Visich also told them that she would follow up with a specialist the following week and keep them informed.

38. On July 7, 2024, Ms. Visich informed Ms. Bluhm that the X-ray and ultrasound indicated she would need to make an appointment with a knee specialist. Ms. Visich also told Ms. Bluhm that she was taking ibuprofen or Advil to manage her pain and swelling, and that her doctor believed her meniscus might be damaged.

**Defendants' Response and Failure to Accommodate**

39. Despite being on notice of the injury, its severity, and the need for accommodation—including the previously promised summer staff—Defendants took no steps to reduce Ms. Visich's workload or to provide any assistance. Instead, they continued to require her to perform, at the same hectic pace, the same

physically demanding tasks—including lifting, bending, stair-climbing, and traversing the expansive property.

40. Defendants neither inquired about possible accommodations nor offered assistance or reprieve from Ms. Visich's physically taxing responsibilities. Although their initial reactions included surface-level expressions of sympathy, their actions were inconsistent with any genuine concern. For example, they did not advise her to end work early on the day of the injury, nor did they follow up with offers of support or flexibility thereafter.

41. After being informed of the injury's severity and the distinct possibility of surgery being necessary, Defendants' tone shifted markedly. Leslie Bluhm, in particular, became cold and far less communicative—an abrupt change from her earlier engagement with Ms. Visich.

**Failure to Provide the Promised Additional Staffing**

42. At no point did Defendants hire the additional summer staff they had previously promised, despite the increased urgency created by Ms. Visich's injury.

43. On July 8, 2024, Olga Visich spoke with Defendants' recruiter and agent, Aleksandra Kardwell, to report her injury and reiterate the need for the supplemental staff that had been promised for the busy summer season. Ms. Visich also asked Ms. Kardwell to speak directly with Leslie Bluhm about the situation.

Ms. Kardwell replied that she had already emailed Ms. Bluhm about the issue and would follow up again by phone and email.

44. Ms. Kardwell assured Ms. Visich that she would convey the urgency of the request to Defendants.

45. On July 10, 2024, Ms. Kardwell followed up with Ms. Visich to report that she had identified a woman who could begin working as soon as the next day.

46. Ms. Kardwell also confirmed that she had emailed Leslie Bluhm on July 8 about the situation but had received no response.

47. When Ms. Visich explained that Manager Chris Alas had told her and her husband that they needed to "save the family money," Ms. Kardwell replied, in sum and substance, this is not the time to save money.

48. On July 10, 2024, Ms. Visich told Ms. Bluhm that she had also been prescribed meloxicam (15 mg) to manage her pain and swelling. In response, Ms. Bluhm asked whether medication was helping reduce the pain, and Ms. Visich responded that the prescription alone was not enough. Ms. Visich also explained that her doctor had advised her to wear a knee brace, which she began doing immediately and continued to wear at work through the date of her termination. The brace, along with her limp, was plainly visible throughout this period.

49. On July 11, 2024 Ms. Visich met Ms. Bluhm in person and told her that the doctor told her she would need a steroid injection in her knee, that the meniscus in her left knee was damaged and might be torn, and that an MRI would have to be done to confirm that, and that if her meniscus was torn, she might need to have surgery.

50. After receiving the MRI results, Ms. Visich informed Ms. Bluhm on July 29, 2024, that she had a likely torn meniscus, and Ms. Visich and Ms. Bluhm each agreed that Ms. Visich would likely need surgery to fix it.

51. Despite the confirmation that Ms. Visich's meniscus was likely torn and the obvious need for the previously-promised assistance during the busy season which Defendants could very easily afford to provide, Defendants still took no action.

52. Throughout the busy season, Ms. Visich and her husband Andrei continued to perform the work of multiple employees, including housekeeping, laundry, guest services, meal preparation, and exterior property maintenance. Defendants' failure to accommodate Ms. Visich's medical condition, coupled with their failure to provide the promised additional staffing, required her to continue working under physically taxing conditions, exacerbating her inflammation and pain.

**Defendants' Attitude Towards Plaintiffs Changed After Learning That Olga Visich's Condition Might End Up Requiring Surgery**

53. Defendants assessed Plaintiffs and their performance positively before Olga Visich's injury.

54. Although Defendants' initial responses to Olga Visich's injury included certain expressions of concern and sympathy, their actions did not reflect those sentiments. For example, they did not tell her it was acceptable to stop working and seek immediate medical attention on the day of the injury, did not provide the previously promised additional help, and did not ask whether she needed any accommodations in light of her condition.

55. After being informed of the severity of Ms. Visich's injury and the likelihood that surgery would be required, Defendants' demeanor shifted. They became more distant, and ceased assessing Plaintiffs' performance positively. In particular, Leslie Bluhm appeared uncomfortable around Ms. Visich and seemed, at times, visibly triggered by the sight of her limping or wearing a knee brace—responding with visible discomfort, abrupt changes in tone, or conspicuous avoidance.

56. In addition, in contrast to how Plaintiffs were treated before Olga Visich's injury, Defendants also periodically made exaggerated or unsubstantiated

criticisms of Plaintiffs and their work after learning of the need for Olga Visich to have surgery.

**Defendants Discouraged Medical Leave and Reacted Negatively to Plaintiff's Medically Necessary Surgery**

57. Although Plaintiff Olga Visich initially pursued conservative treatment for her torn meniscus—including pain medication, a cortisone injection, and physical therapy—her workload remained physically demanding, and the lack of accommodation exacerbated her condition. Despite her efforts to avoid surgery, the continuing pain and swelling made clear that surgical intervention would ultimately be needed.

58. Ms. Visich deferred surgery until December 13, 2024, for multiple reasons. First, in May 2024, Defendants' Manager, Chris Alas, admonished Plaintiffs not to schedule medical appointments during the busy summer season and to "try their best to stay healthy," which Plaintiffs reasonably understood to mean that Defendants disapproved of any medical needs that might interfere with work. Second, at Labor Day 2024, Plaintiffs were told—contrary to earlier representations—that their workload would remain relatively busy for some time after Labor Day, and that substantial preparations would be needed for the family's plans to host Thanksgiving weekend. Manager Alas had previously told Plaintiffs

that their hours would be "very light" after Labor Day, but in reality, Plaintiffs continued working full-time and often overtime throughout much of the post-Labor Day pre-Thanksgiving period. And third, Plaintiffs were told that work obligations from December through February would be very light, making that window a logical and minimally disruptive time for the delayed surgery.

59. Ms. Visich notified Manager Alas of her scheduled surgery on December 2, 2024—eleven days before the procedure. The eleven-day advance notice reflected her understanding that December was a very slow period, during which her husband and co-worker, Plaintiff Andrei Visich, could cover her duties without strain. The timing of the notice also reflected Ms. Visich's well-founded concern—based on past experiences with Defendants—that revealing her need for surgery would be met with hostility.

60. Defendants' reaction confirmed those concerns. Defendants did not offer support or acknowledge Ms. Visich's medical needs. Instead, on December 4, 2024, Leslie Bluhm reacted to the news that the previously-anticipated surgery was going to happen by sending Ms. Visich a message deliberately mislabeling her condition as an "illness," instructing her to notify Defendants of "illness" in advance, and asking how long she would be out so Defendants could "plan" and determine "what Andrei's plan is while you are not working."

61. Instead of offering Ms. Visich any accommodation during the months following her July 2024 injury—when Defendants knew she was continuing to work very long hours while visibly injured and limping during the busy season, and knew that she in fact continued to keep up with scheduled maintenance during the post-season—Defendants, acting through Manager Chris Alas, on December 11, 2024 acted as though Ms. Visich had not been working extensive hours while injured and had not been maintaining the property, despite knowing full well that she had done both.

62. Defendants did not propose even a purported accommodation until December 11, 2024—the eve of Ms. Visich's scheduled surgery—based on a belated professed concern, raised five months after the disabling injury occurred, about whether she was "ok enough to do" scheduled maintenance during a period when the workload was light and Plaintiff Andrei Visich was capable of performing the necessary work without additional help.

63. The proposed arrangement consisted of having a seasonal worker, Ruth—the mother of seasonal co-worker Eric—cover Ms. Visich's duties on December 12, the day immediately preceding her surgery (and nominally on the day of surgery itself), while no comparable assistance was offered during the post-surgical recovery period, including after Ms. Visich returned to in-person work

with ongoing physical limitations, even though Plaintiff Andrei Visich had temporarily covered her duties during her post-surgical absence. Upon information and belief, this minimal and last-minute proposal was not intended to accommodate Ms. Visich's disability, but rather to placate Eric, who had repeatedly pressed Alas to increase his mother's work hours for financial reasons.

64. Manager Alas's disingenuous proposal thus underscored the sharp contrast between Defendants' extended, knowing failure to provide assistance when accommodation was genuinely needed and their token, last-minute gesture made for someone else's benefit once surgery became unavoidable.

65. Ms. Visich was understandably upset by this disingenuous, last-minute "accommodation" offered during a very slow period, following months in which Defendants knowingly failed to account for her disabling injury while requiring her to work under an excessive workload. She immediately complained that she would not have needed surgery had she not been overworked for months without adequate staffing support, and that Defendants required her to continue performing strenuous work while injured and impaired. Regarding the latter point, Ms. Visich alluded to Manager Alas's standing directive that she and her husband always ensure that they did enough work to prevent non-disabled coworkers Eric and Ruth from feeling overwhelmed, and emphasized that the problem did not

occur only on the date of her injury but was instead of a recurring nature, stating: "*And it was not just one time. But you send to all of us [Ms. Visich and her husband] instructions what everyone [Ms. Visich and her husband] has to do!*"

66. Instead of acknowledging that Defendants had effectively required Ms. Visich to work for additional months with her injury before scheduling her surgery, or discussing with her what adjustments to her workload and schedule might be warranted during her recovery, or assuring her that she would not be required to perform physically strenuous tasks before she was fully healed, Defendants chose instead to ignore Ms. Visich's complaint about their role in prolonging her injury and her opposition to continued work expectations that failed to account for her physical limitations while she was still healing.

67. Ms. Visich underwent surgery on December 13, 2024, and was unable to return to in-person work for approximately three and a half weeks. During that time, she experienced significant post-operative complications, including persistent pain and anesthesia-induced migraines.

68. Between December 16, 2024, and her return to the property on January 9, 2025, Ms. Visich continued to perform certain tasks remotely, including communicating with vendors. Plaintiff Andrei Visich covered all of Plaintiffs' in-

person responsibilities during this time, which he was able to manage due to the reduced winter workload.

69. Although Mr. Visich was capable of performing Ms. Visich's tasks, he could not execute them in the exacting and "perfect" manner that Leslie Bluhm routinely expected of Ms. Visich.

70. As a result, Ms. Visich felt pressure to return to the property on January 9 rather than take more time to recover. She understood from experience that Defendants—particularly Ms. Bluhm—would not tolerate deviations from the exact standards Ms. Visich was known to deliver.

71. Given that Mr. Visich's temporary coverage imposed no added cost on Defendants, Ms. Bluhm's December 4 message was not a bona fide logistical concern, but an expression of irritation or resentment that Ms. Visich's injury was serious enough to require surgery, despite the fact that Defendants would incur no additional cost for her absence.

72. Ms. Visich returned to in-person work on January 9, 2025, still recovering and relying on crutches.

73. From January 9 through mid-January 2025, she used two crutches at all times while working at the property.

74. From mid-January through mid-to-late March 2025, she used one crutch while working indoors and two crutches while working outdoors.

75. Despite her condition, she resumed physically demanding work to the extent possible.

76. Meanwhile, Mr. Visich continued to handle portions of her workload to compensate.

77. After returning to work, Ms. Visich continued to experience significant pain, and a post-surgical MRI revealed that inflammation in her knee had formed a cyst, which required drainage on April 8, 2025.

78. On April 16, 2025, Manager Chris Alas flew in from Chicago to inspect the mansion and property and to meet with Plaintiffs in person for the first time in approximately a year. At the time, Ms. Visich was still wearing a knee brace and undergoing physical therapy after work hours.

79. Upon information and belief, based on Defendants' various comments and behaviors since Ms. Visich's injury—and especially after learning of her need for surgery—Defendants unfairly stereotyped Plaintiffs, then aged 56 and 57, respectively, as being physically unsuited due to age and condition to perform the tasks required of their positions.

80. During that April 16, 2025 visit, Alas saw that the mansion and property were immaculate, and was unable to find anything wrong with Plaintiffs' maintenance of the mansion or property.

81. Because Alas appeared excessively formal and continued to conspicuously avoid any acknowledgement of Ms. Visich's injury or condition, Mr. Visich took the opportunity to revisit Ms. Visich's prior complaint about having been effectively required to work for additional months with her injury before scheduling surgery, and to oppose any further unrealistic work expectations during her recovery.

82. He did so by re-emphasizing to Alas that Ms. Visich had worked very hard even while injured and in pain as was expected of her, and gestured toward her knee brace, with Ms. Visich nodding in approval.

83. In response, Alas conspicuously turned away and acted as though he had not heard the comment or seen the gesture.

84. Three weeks later, on May 7, 2025, Alas returned to the property with a healthy-looking younger man (believed to be in his late 20s or early 30s), who was introduced as "Max." Alas explained that Max would be helping Plaintiffs serve guests during the summer and instructed Plaintiffs to prepare photographs documenting the service and setup process for Max to study.

85. Ms. Visich complied. A call was then scheduled that evening between Plaintiffs and B&C Partners LLC's agent, Gail Silver. During that call, Ms. Silver informed Plaintiffs that their employment was terminated.

86. When Ms. Visich asked for the reason, Ms. Silver replied "They want something different."

87. Upon information and belief, based on the extended period it took Defendants to identify service staff who met their unusually high standards, and the timing of Plaintiffs' termination—shortly before the start of the busy season—Defendants had been contemplating Plaintiffs' termination for a few months prior to formally announcing it. To the extent the decision had not yet been finalized as of Manager Alas's in-person visit on April 16, 2025, Plaintiffs believe that events occurring during or shortly after that visit—including Mr. Visich's attempt to revisit concerns about Defendants' treatment of Ms. Visich's injury and recovery—likely played a role in precipitating the final decision.

88. Upon information and belief, following Plaintiffs' termination, the duties that Plaintiffs had performed were performed by non-disabled and younger persons.

**<u>First Cause of Action</u>**

**Disability Discrimination in Violation of the**
**<u>New York State Human Rights Law (NYSHRL)</u>**

**(On behalf of Plaintiff Olga Visich Against**
**Defendants B&C Partners, Leslie Bluhm, and David Helfand)**

89. Plaintiffs incorporate the Complaint's preceding paragraphs by reference.

90. For purposes of Plaintiffs' NYSHRL claims, at all material times herein, Defendants B&C Partners, Leslie Bluhm, and David Helfand, singly and collectively, were Plaintiffs' "employer" (Executive Law § 292(5)) and Plaintiffs were their "employees."

91. The NYSHRL and its implementing regulations make it unlawful for employers to discriminate against employees on account of a disability. New York Executive Law § 296(1) provides, in pertinent part:

> It shall be an unlawful discriminatory practice:
>
> (a) For an employer …, because of an individual's … disability … to … bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
>
> ***
>
> (h) For an employer … to subject any individual to harassment because of an individual's … disability …, regardless of

> whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. *** Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. ***

92. New York Executive Law § 292(21) states:

> The term "disability" means (a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held.

93. "Disability" is more broadly defined under the NYSHRL than under the Americans With Disabilities Act. *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 155 (2d Cir. 1998) (superseded in part on other grounds by statute, 42 U.S.C. §12102(3)(A)) (quoting *State Div. of Human Rights ex rel. McDermott v. Xerox Corp.*, 65 N.Y.2d 213, 218 (1985); *Ugactz v. UPS, Inc.*, 2013 U.S. Dist.

LEXIS 43481, at *52 (E.D.N.Y. Mar. 26, 2013) (same); *Miller v. E. Midwood Hebrew Day Sch.*, 2021 U.S. Dist. LEXIS 28898, at *10 (E.D.N.Y. Feb. 15, 2021) (same); *Thomson v. Odyssey House*, 2015 U.S. Dist. LEXIS 125887, at *56 (E.D.N.Y. Sep. 21, 2015) (same).

94. Specifically, "any 'medically diagnosable impairment' is a disability under the NYSHRL." *Baron v. Advanced Asset & Prop. Mgmt. Sols.*, LLC, 15 F. Supp. 3d 274, 282 (E.D.N.Y. 2014) (citing *Barr v. N.Y.C. Trans. Auth.*, 2002 U.S. Dist. LEXIS 2968, at *8 (E.D.N.Y. Feb. 20, 2002)); *Croons v. N.Y. State Office of Mental Health*, 18 F. Supp. 3d 193, 213 (N.D.N.Y. 2014) (same); *Levy v. Chevrolet (In re Estate of Levy)*, 2008 U.S. Dist. LEXIS 101701, at *22 (E.D.N.Y. Dec. 17, 2008) (same).

95. "[R]egulations implementing the NYSHRL provide [that] '[a] current employee experiencing a temporary disability is protected by the Human Rights Law where the individual will be able to satisfactorily perform the duties of the job after a reasonable accommodation in the form of a reasonable time for recovery.'" *Miloscia v. B.R. Guest Holdings LLC*, 33 Misc. 3d 466, 475 (N.Y. Sup. 2011), *aff'd in relevant part,* 94 A.D.3d 563 (1st Dept. 2012) (citing 9 NYCRR 466.11(i)(1); *Borbon v. Area 145, Inc.*, 2015 N.Y. Misc. LEXIS 4985, at *12 (N.Y. Sup. 2015) (same, citing 9 NYCRR 466.11(i)(1)); see also *Attis v. Solow Realty Dev. Co.*, 522

F. Supp. 2d 623, 631 (S.D.N.Y. 2007) (dismissing ADA discrimination claim but not analogous NYSHRL claim where the plaintiff suffered a temporary injury); *Kong v. Wing Keung Enters.*, 2017 U.S. Dist. LEXIS 205331, at *7 (E.D.N.Y. Aug. 8, 2017) (to same effect); *Hamilton v. Westchester County*, 3 F.4th 86, 93 (2d Cir. 2021) (knee injury case clarifying that even the ADA—which affords less protection than the NYSHRL—covers "transitory impairments lasting or expected to last less than six months[.]").

96. Olga Visich's above-referenced torn meniscus and related injuries each caused medically diagnosable impairments, e.g., severe impairment of her ability to walk, bear her weight, climb stairs, etc., which constituted a disability under the NYSHRL and its implementing regulations.

97. Olga Visich was capable of satisfactorily performing the duties of the job after a reasonable accommodation, including, without limitation, an accommodation in the form of the previously-promised additional help during the busy season, and adequate time off to heal from her disabling injury. 9 NYCRR 466.11(i)(1).

98. Defendants discriminated against Ms. Visich in the terms, conditions, and privileges of her employment because of her medically diagnosed impairments (disability) and related medical needs. Defendants did so by, inter alia:

(a) Failing to provide reasonable accommodations for her disability, including the promised supplemental staff during the busy summer season, despite being repeatedly placed on notice of her injury, physical limitations, and the need for support;

(b) Requiring her to continue performing strenuous physical tasks—including stair-climbing, lifting, and cleaning—without proper assistance or modification, even after they were aware of her torn meniscus and associated impairments;

(c) Discouraging her from scheduling medically necessary treatment until work was slow, and gratuitously criticizing her when she later notified them that she had scheduled the delayed surgery during a very slow period that imposed no burden at all on Defendants;

(d) Displaying discomfort and emotional distance upon learning that surgery might be required, and thereafter minimizing contact, ignoring her physical condition, and refusing to acknowledge the need for post-surgical recovery support;

(e) Shunning Ms. Visich and responding to her with a negative tone, reduced interaction, and visual avoidance of her disability (e.g., limp and knee brace);

(f) Treating her with greater scrutiny and less respect following her injury, including periodically fabricating performance criticisms that were inconsistent with prior feedback and unsupported by facts;

(g) Stereotyping her, implicitly and explicitly, as being too old or physically incapable of continuing to meet Defendants' exacting standards, despite her extensive experience and prior record of exceptional performance;

(h) Failing to engage in a reasonable interactive process to explore potential accommodations or alternatives, even when her need for relief or recovery time was obvious;

(i) Ignoring her complaints—both explicit and implicit—about being overworked and unsupported while injured, and responding with hostility or silence when the issue was raised; and

(j) Planning her termination while she was visibly impaired, and implementing the terminations, and replacing her with one or more non-disabled and significantly younger workers.

99. Moreover, to the extent Defendants' complained-of acts were motivated by retaliatory impulses as discussed below, that is no bar to Plaintiffs' disability discrimination and harassment claim because those claims overlap and also because "a plaintiff's injury can have multiple 'but-for' causes, each one of which may be sufficient to support liability." *Kwan v. Andalex Grp., LLC*, 737 F.3d 834, 854 (2d Cir. 2013) (citations omitted).

100. As a result of its above-referenced conduct, Defendants are liable for all damages caused and all appropriate relief, including, inter alia, back pay, front pay, loss of benefits, compensatory damages (including the stress, anxiety and emotional pain that comes when one's livelihood is impaired), and attorney's fees.

101. In addition, punitive damages should be imposed because Defendants, acting directly and/or through their authorized manager-level employees, engaged in the aforesaid discrimination with malice and with reckless indifference to Plaintiffs' statutory rights not to be subjected to the above-referenced illegal discriminatory treatment in the workplace. See *Doe v. Long Island Motors, Inc.*,

2022 U.S. Dist. Lexis 102851, at *24 (E.D.N.Y. June 8, 2022) (quoting N.Y. Executive Law § 297(9), effective Oct. 11, 2019).

**<u>Second Cause of Action</u>**

**<u>Retaliation in Violation of the NYSHRL</u>**

**(On behalf of Plaintiff Olga Visich Against Defendants B&C Partners, Leslie Bluhm, and David Helfand)**

102. Plaintiffs incorporate the Complaint's preceding paragraphs by reference.

103. New York Executive Law § 296(1) provides, in pertinent part:

> It shall be an unlawful discriminatory practice: *** (h) For an employer … to subject any individual to harassment … because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint …, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. *** Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared. ***

104. New York Executive Law § 296(7) provides:

> It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate

> or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint***

105. Plaintiffs engaged in protected activity within the meaning of the NYSHRL when Ms. Visich expressly and implicitly opposed discriminatory and unlawful employment practices—namely, Defendants' failure to accommodate her disability, their requirement that she continue performing physical labor while visibly injured and in pain, and their imposition of unrealistic post-surgical work expectations that ignored her medical condition.

106. On December 11, 2024, in response to inquiries from Manager Chris Alas about her ability to perform upcoming maintenance tasks, Ms. Visich complained that she "would not have needed surgery at all" had Defendants not overworked her without adequate staffing support, and made clear then and in post-surgery follow-up communications that she opposed any further unrealistic work expectations placed upon her while she was still healing. Ms. Visich's communications sufficed to identify the discriminatory conduct, express her disapproval of it, and oppose its continuation, and therefore constituted protected activity under the NYSHRL. See *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011) (employee "opposes" discrimination where she communicates, even implicitly, that she believes the employer's conduct is wrongful), applied to

NYSHRL claims in *Arazi v. Cohen Bros. Realty Corp.*, 2022 U.S. Dist. LEXIS 56549, at *46–47 (S.D.N.Y. Mar. 28, 2022).

107. In addition, during Manager Alas's April 16, 2025 visit to the property—the first time he had seen Plaintiffs in person in nearly a year—Plaintiff Andrei Visich repeated and amplified Ms. Visich's protected complaint in her presence and with her express approval. He stated in substance that Ms. Visich "had worked very hard—even while injured and in pain," emphasized that she had been effectively required to work for additional months with her injury before scheduling surgery, and opposed any further unrealistic expectations while she remained visibly disabled and recovering. Ms. Visich nodded in agreement, thereby jointly communicating their opposition to Defendants' past and ongoing discriminatory conduct. Defendants are chargeable with knowledge of protected activity when an employee communicates, even indirectly, that she believes the employer's conduct was discriminatory. *Albunio*, supra, 16 N.Y.3d at 479; *Arazi*, *supra* (*Albunio* framework applies to NYSHRL retaliation claims)

108. Each of these communications was made directly to Manager Alas—Defendants' designated on-site and remote supervisor, who exercised control over Plaintiffs' work assignments, hours, job expectations, and the flow of information to the "Family" (Leslie Bluhm, David Helfand, and Neil Bluhm). Because Alas

was at all relevant times acting within the scope of his authority as Defendants' agent, his knowledge of Plaintiffs' protected activity is imputed to each Defendant. Moreover, upon information and belief, Alas affirmatively relayed Plaintiffs' statements to Defendants Leslie Bluhm and David Helfand, particularly given the significance of the issues raised and the supervisory context in which the communications occurred.

109. Accordingly, Defendants were fully aware that Plaintiffs had engaged in protected activity under the NYSHRL, satisfying the second element of the governing test. Defendants' subsequent actions—including their stonewalling, abrupt withdrawal of support, heightened coldness, conspicuous avoidance of further discussion of Ms. Visich's disability and surgery, and ultimate termination of Plaintiffs just weeks after the last of these protected communications—occurred after Defendants were placed on clear notice that Plaintiffs were opposing what they reasonably believed to be unlawful discrimination and failure to accommodate.

110. After Defendants were placed on notice that Ms. Visich had engaged in protected activity—opposing their failure to accommodate her disability and criticizing the conditions that caused and prolonged her injury—Defendants did not acknowledge or address the concerns she had raised, made no effort to revisit

her recovery needs, and avoided any further engagement with her physical condition. Most notably, within weeks of Manager Alas hearing that prior complaint and opposition reiterated in person—an exchange to which he responded by abruptly turning away and ignoring the comment—Defendants terminated Ms. Visich's employment without explanation, despite the excellent level of maintenance and service Plaintiffs were continuing to provide. They replaced both Plaintiffs with significantly younger, non-disabled staff. That decision, made while Ms. Visich was still visibly recovering from surgery and actively performing her duties, constituted a materially adverse action reasonably likely to deter a reasonable person from engaging in protected activity.

111. As a result of its above-referenced conduct, Defendants are liable for all damages caused and all appropriate relief, including, inter alia, back pay, front pay, loss of benefits, compensatory damages (including the stress, anxiety and emotional pain that comes when one's livelihood is impaired), and attorney's fees.

112. In addition, punitive damages should be imposed because Defendants, acting directly and/or through their authorized manager-level employees, engaged in the aforesaid retaliation with malice and with reckless indifference to Plaintiffs' statutory rights not to be subjected to the above-referenced illegal retaliatory treatment in the workplace.

## Third Cause of Action

## Associational Discrimination and Retaliation in Violation of the New York State Human Rights Law

**(On behalf of Plaintiff Andrei Visich Against Defendants B&C Partners, Leslie Bluhm, and David Helfand)**

113. Plaintiffs incorporate the Complaint's preceding paragraphs by reference.

114. The New York State Human Rights Law ("NYSHRL") prohibits employers from discriminating against an employee because of that employee's known association with a person in a protected class, including a person with a disability. See *Chiara v. Town of New Castle*, 126 A.D.3d 111 (2d Dep't 2015) (holding that discrimination based on an employee's association with a member of a protected group is prohibited under the NYSHRL); 9 NYCRR § 466.14 ("It is an unlawful discriminatory practice for an employer to discriminate against an individual because of the known relationship or association of that individual with someone in a protected category.").

115. Plaintiff Andrei Visich is married to co-Plaintiff Olga Visich and, at all relevant times, Defendants associated him with her as a spouse and co-worker who he was closely tied to. Defendants were fully aware of this association and

employed both Plaintiffs as a married domestic couple working together at Defendants' Southampton estate.

116. As described above, Plaintiff Olga Visich suffered a work-related injury that constituted a disability under the NYSHRL. Andrei Visich was closely involved in her care and recovery, provided physical assistance at work to compensate for her injury, and participated in protected activity by supporting and reinforcing her opposition to Defendants' discriminatory conduct.

117. After Ms. Visich began displaying visible signs of disability, and particularly after she notified Defendants of the need for medically necessary surgery, Defendants' demeanor toward both Plaintiffs changed markedly. Defendants ceased offering positive feedback, began expressing frustration over Ms. Visich's condition, and ultimately took adverse action against both Plaintiffs, terminating their employment on the eve of the busy season despite no performance-based justification.

118. Defendants' conduct and comments indicate that Defendants perceived Ms. Visich's injury and medical condition as a liability or inconvenience and, in response, elected to terminate both Plaintiffs and replace them with one or more significantly younger, non-disabled workers. By terminating Andrei Visich alongside his disabled wife, despite his ability to fully perform his job duties and

his lack of any disciplinary history, Defendants effectively punished him for his association with a disabled person and the perceived burden that association posed.

119. Defendants' termination of Plaintiff Andrei Visich was due, at least in part, to his known very close and supportive relationship with a disabled person and his expressed opposition to Defendants' discriminatory treatment of her, and Defendants' assumption that he would be less valuable as an employee due to that relationship. This constituted unlawful associational discrimination and retaliation under the NYSHRL.

120. As a result of its above-referenced conduct, Defendants are liable for all damages caused and all appropriate relief, including, inter alia, back pay, front pay, loss of benefits, compensatory damages (including the stress, anxiety and emotional pain that comes when one's livelihood is impaired), and attorney's fees.

121. In addition, punitive damages should be imposed because Defendants, acting directly and/or through their authorized manager-level employees, engaged in the aforesaid discrimination and retaliation with malice and with reckless indifference to Plaintiffs' statutory rights not to be subjected to the above-referenced illegal discriminatory treatment in the workplace.

**Fourth Cause of Action**

**Retaliation in Violation of New York Labor Law § 215**

**(On behalf of Both Plaintiffs Against Defendants B&C Partners, Leslie Bluhm, and David Helfand)**

122. Plaintiffs incorporate the preceding paragraphs of this pleading herein.

123. For purposes of Plaintiffs' Labor Law § 215 claim, at all material times herein, Defendants B&C Partners, Leslie Bluhm, and David Helfand, singly and collectively, were Plaintiffs' "employer" (Labor Law § 2(5)) and Plaintiffs were their "employees." Labor Law § 2(6).

124. Labor Law § 215(1)(a) provides, in pertinent part, that "No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee *** (viii) because such employee has used any legally protected absence pursuant to federal, local, or state law."

125. Ms. Visich's leave to undergo and recover from knee surgery was protected under, inter alia, the NYSHRL.

126. The retaliatory or discriminatory acts complained of, most notably wrongful termination, would be reasonably likely to deter a person from engaging

in protected activity, including taking the full recommended or appropriate time to heal from such surgery.

127. Accordingly, Defendants' discriminatory and retaliatory adverse actions against Plaintiffs (most notably, termination) for Ms. Visich's leave to undergo and recover from knee surgery and for Mr. Visich's very close association with Ms. Visich and her decision to undergo such medically necessary surgery and take limited post-surgery leave to recover, were in violation of Labor Law § 215(1)(a)(viii).

128. For their unlawfully retaliatory conduct, Defendants are liable for all damages caused and all appropriate relief, including, inter alia, back pay, front pay, liquidated damages, compensatory damages (including the stress, anxiety and emotional pain that comes when one's livelihood is impaired), and attorney's fees.

129. In addition, punitive damages should be imposed because Defendants, acting directly and/or through their authorized manager-level employees, engaged in the aforesaid discrimination and retaliation with malice and with reckless indifference to Plaintiffs' statutory rights not to be subjected to the above-referenced retaliation. See, e.g., *Flannigan v Vulcan Power Group, LLC*, 642 F App'x 46, 53 (2d Cir 2016).

130. Notice of the filing of this claim was served on the New York Attorney General (through counsel) at or before the filing of this claim.

**Fifth Cause of Action**

**Unpaid Overtime in Violation of the FLSA**

**(On Behalf of Both Plaintiffs Against All Defendants)**

131. Plaintiffs incorporates the Complaint's preceding paragraphs by reference.

132. In 1974 Congress amended the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., to include within its coverage private domestic workers. See 29 U.S.C. §§ 202(a), 206(f), 207(l ), 213(a)(15) and 213(b)(21); See also *Francois v. Mazer*, 2012 WL 653886, at *1 (S.D.N.Y. Feb. 28, 2012) (domestic employees working in private households are covered by the FLSA).

133. FLSA Section 2 (entitled "Congressional finding and declaration of policy") provides, in pertinent part, that "Congress ... finds that the employment of persons in domestic service in households affects commerce." 29 U.S.C. § 202(a).

134. FLSA Section 207 provides, in pertinent part:

(l) Employment in domestic service in one or more households

> No employer shall employ any employee in domestic service in one or more households for a workweek longer than forty hours unless such employee receives compensation for such employment in accordance with subsection (a) of this section.

U.S.C.A. § 207(a)(1) and (l).

135. Accordingly, Plaintiffs were entitled to overtime pay "at a rate not less than one and one-half times the regular rate at which [they were] employed." Id.

136. At the time they were hired, Plaintiffs were not told what their actual working hours would be.

137. Plaintiffs are therefore presumed to have been hired to work for eight hours per day, New York Labor Law § 160(3) (specifying eight hours per day as the regular work day), or 40 hours per week. *Moon v. Kwon*, 248 F.Supp.2d 201, 207 (S.D.N.Y. 2002) (Lynch, J.) ("Unless the contracting parties intend and understand the weekly salary to include overtime hours at the premium rate, courts do not deem weekly salaries to include the overtime premium for workers regularly logging overtime, but instead hold that weekly salary covers only the first 40 hours."); *Jiao v. Shi Ya Chen*, 2007 WL 4944767 (S.D.N.Y. 2007).

**Defendants Violated the FLSA by Failing to Pay Overtime**

138. During the busy summer season (Memorial Day to Labor Day), Plaintiffs generally worked six to seven days per week for 12-15 hours per day,

and sometimes longer. Plaintiffs also worked more than 40 hours per week in the weeks shortly before Memorial Day and shortly after Labor Day.

139. At all times mentioned herein, Defendants failed to comply with the FLSA, in that Defendants frequently required and permitted Plaintiffs to work more than 40 hours per week, but provision was not made by Defendants to pay Plaintiffs at the rate of one and one-half times the regular rate for the hours worked in excess of the hours provided for in the FLSA (29 U.S.C. § 207).

140. Upon information and belief, Defendants are and were at all relevant times herein aware that overtime pay is mandatory for non-exempt employees who work more than 40 hours per week.

141. Defendants are and were at all material times herein fully aware that Plaintiffs worked more than 40 hours per week as indicated, without receiving compensation for any of that additional work.

142. No agreement existed between the parties with respect to the payment of overtime for hours worked in excess of 40 in a work-week.

143. Consistent with the foregoing, Defendants are liable to Plaintiffs for unpaid overtime in amounts to be determined at trial, together with liquidated damages, attorney’s fees, interest, and costs.

**<u>Sixth Cause of Action</u>**

**Unpaid Overtime in Violation of § 142-2.2 of Title 12 of New York's Codes, Rules and Regulations ("NYCRR") <u>and New York Labor Law ("NYLL") §§ 663(1), 652(1) and 190, et seq.</u>**

**(On Behalf of Both Plaintiffs Against All Defendants)**

144. Plaintiffs incorporate the preceding paragraphs by reference.

145. Under NYLL Article 19, "employer" is defined to include "any … corporation … acting as employer." NYLL § 651(6).

146. 12 NYCRR § 142–2.14 was enacted pursuant to the NYLL and defines "employee" "any individual employed, suffered or permitted to work by an employer," with exceptions not relevant here. 12 NYCRR § 142–2.14.

147. At all material times herein, Plaintiffs were employees of Defendants.

148. "[NYLL] § 655 authorizes the wage board to recommend regulations governing overtime, while § 656 directs the Commissioner to either accept or reject any regulations recommended by the wage board, and, pursuant to this delegated authority, there are regulations governing overtime pay." *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 351-53 (E.D.N.Y. 2014) (citing §§ 142-2.2, 146-1.4).

149. The overtime regulation promulgated by the New York State Commissioner of Labor (12 NYCRR § 142-2.2) provides that "[a]n employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13" of 29 U.S.C. § 201, et seq., the Fair Labor Standards Act ("FLSA").

150. "This regulation has been widely recognized as comprising New York state law." *Rocha v. Bakhter Afghan Halal Kababs, Inc.*, 44 F. Supp. 3d 337, 351 (E.D.N.Y. 2014); *Ji v. Belle Work Beauty, Inc.*, 2010 NY LEXIS Misc. 3825 at *18, 2010 NY Slip Op 32166(U) (Sup. Ct. N.Y. Co. 2010) ("[T]he First Department recognized…that a plaintiff can state a cause of action for overtime wages based on a violation of 12 NYCRR § 142-2.2.") (citing *Anderson v. Ikon Office Solutions, Inc*., 38 AD3d 317 (1st Dept. 2007)); see also *Bonito v. Avalon Partners, Inc*., 106 A.D.3d 625, 626 (1st Dept. 2013).

151. "Under the regulations implementing the New York Labor Law, non-exempt employees must be paid at a rate of 'not less than one and one-half times the regular rate at which he is employed' for any hours worked in excess of forty hours in a given week." *Thomas v. Meyers Assocs., L.P.*, 39 Misc. 3d 1217(A) (N.Y. Sup. 2013) (citing 12 NYCRR 142-2.2).

152. "Labor Law § 663 authorizes a civil action for overtime wages in accordance with 12 NYCRR 142-2.2." *Ansah v. A.W.I. Sec. & Investigation, Inc.*, 2014 NY Misc. LEXIS 1690 at *26 (Sup. Ct. N.Y. Co. 2014) (citing *Stennett v. Moveway Transfer & Stor., Inc*., 97 A.D.3d 655, 657 (2d Dept. 2012)).

153. Plaintiffs were entitled to be paid at the rate of 1½ times their regular rate of pay for all time worked in excess of 40 hours per week.

154. No agreement existed between the parties with respect to the payment of overtime for hours worked in excess of 40 hours in a workweek.

155. Defendants failed to comply with, *inter alia*, 12 NYCRR § 142-2.2 and NYLL Articles 19 and 6 in that Plaintiff, with Defendants' actual and constructive knowledge, often worked more than 40 hours per week as indicated, but without being compensated for those additional hours.

156. Upon information and belief, Defendants are and were at all relevant times herein aware that overtime pay is mandatory for non-exempt employees who work more than 40 hours per week.

157. Accordingly, Defendants are liable to Plaintiffs for unpaid overtime, liquidated damages, interest, and costs in an amount to be determined at trial, and which is in excess of the Local Arbitration Rule 83.7 monetary threshold.

WHEREFORE, Plaintiffs respectfully requests judgment awarding the damages referenced herein, together with statutory attorney's fees, liquidated/statutory damages, costs, disbursements, pre- and post-award interest, and such other and further relief as is just and proper, including an offset for the negative tax consequences of receiving a lump sum payment for lost wages and benefits (*Saber v. N.Y. State Dep't of Fin. Servs.*, 2018 U.S. Dist. Lexis 126161, at *6-7 (S.D.N.Y. 2018) ("Awarding Plaintiff this amount is necessary to restore him to the position he would have achieved absent discrimination.") (citing *Gulino v. Bd. of Educ. of the City Sch. Dist. of N.Y.*, 2016 U.S. Dist. Lexis 102216, at *3 (S.D.N.Y. 2016)).

JURY TRIAL DEMAND: Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: December 17, 2025

Respectfully submitted,

Law Offices of Scott A. Lucas
600 Mamaroneck Avenue, Suite 400
Harrison, NY 10528
(646) 342-1139
scott@lucasemploymentlaw.com
*Attorneys for Plaintiffs*
*Olga Visich and Andrei Visich*

By: */S/ Scott A. Lucas*
Scott A. Lucas